## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

| | |
|---|---|
| Shane Micheal Torres, | Case No. 09-06195-als7 |
| Debtor | Chapter 7 |
| Bank Iowa – West Des Moines, | Adv. Pro. 10-30048-als |
| Plaintiff | |
| v. | |
| Shane Micheal Torres, | |
| Defendant | |

**MEMORANDUM OF DECISION**
**(date entered on docket: April 4, 2011)**

COURSE OF PROCEEDING

On December 28, 2009, Shane Micheal Torres ("Torres" or "Defendant") filed a voluntary chapter 7 proceeding. On March 23, 2010, Bank Iowa Corporation ("Bank Iowa" or "Plaintiff") filed a timely adversary proceeding complaint objecting to dischargeability of debt pursuant to 11 U.S.C. sections 523(a)(2)(A), 523(a)(2)(B) and 523(a)(6). Trial was conducted on Plaintiff's complaint on January 10, 2011. Bank Iowa was represented by Bradley R. Kruse, and Torres appeared pro se. The matter is now fully submitted. The court has jurisdiction of these matters pursuant to 28 U.S.C. sections 157(b)(1) and 1334.

FACTS

Torres was the President and owner of Novel Homes, Inc. ("Novel Homes"), an Iowa corporation. Since its inception the corporation arranged for business and construction loans with

Bank Iowa. Beginning in 2007, Torres became Bank Iowa's primary contact on matters related to Novel Homes.

On November 19, 2007, Torres personally signed an unlimited Guaranty for payment and performance of any debt, liability and obligation which Novel Homes may "now or at any time hereafter" owe Bank Iowa ("Guaranty"). The document indicates that it is secured by a 1993 Rockwood Travel Trailer.

On April 24, 2008, Torres, as President of Novel Homes, executed a note in favor of Bank Iowa in the amount of $76,650.00 ("Equipment Loan"). At the time of the Complaint, the current balance on the Equipment Loan was $22,073.15. The note provides that it is separately secured by a security agreement dated 11-19-2007 and a personal guarantee [sic] dated 11-19-2007.

On December 18, 2008, Torres, as President of Novel Homes, executed a note in favor of Bank Iowa in the amount of $153,000.00 ("Accounts Receivable Loan"). The purpose of the Accounts Receivable Loan was to provide Novel Homes with a line of credit. At the time of the Complaint, the current balance on the Accounts Receivable Loan was $135,403.78. The note provides that it is separately secured by Security Agreements dated 10-23-07, 10-26-07, and 11-19-07[1] and a personal guaranty dated 12-18-2008. [2]

On March 18, 2009, Novel Homes furnished Bank Iowa with an accounts receivable aging report ("AR Report") indicating that Novel Homes had outstanding accounts receivable

---

[1] Bank Iowa is listed on the Schedule D of the Debtor's bankruptcy filing as a "creditor holding secured claim" in the amount of $218,431.00. The bankruptcy schedules were entered into evidence by the Plaintiff at the trial. (See Plaintiff's Exhibit 19 which was replaced by Exhibit 26.) Bank Iowa did not, however, present any additional evidence which would prove that it held a secured interest or that any such interest was properly perfected. Absent from the trial record are copies of any of the security agreements identified in the loan documents or verification of UCC filings with the Iowa Secretary of State.

[2] The personal guaranty specifically identified under the Accounts Receivable Loan is not the same as the Guaranty dated November 19, 2007 and admitted as exhibit number 1. The record does not contain a copy of the guaranty dated December 18, 2008.

owing in the amount of $244,254.64. Novel Homes also provided a Profit and Loss Statement and Balance Sheet dated the same day. These items were prepared by Torres on behalf of Novel Homes.

On March 23, 2009, Torres, as President of Novel Homes executed a note in favor of Bank Iowa in the amount of $30,050.00 ("Builder's Risk Insurance Loan"). At the time of the Complaint, the current balance on the loan was $30,009.92. The note provides that it is separately secured by a security agreement dated 11-19-2007 and a personal guarantee dated 11-19-2007.

On March 23, 2009, Torres, as President of Novel Homes, executed a note in favor of Bank Iowa in the amount of $17,740.00 ("Letter of Credit"). The note provides that it is separately secured by a security agreement dated 03-10-2009.

On April 1, 2008, Torres deposited a check from Continental Western Insurance Group in the amount of $42,654.00 into a Novel Homes account at Bank Iowa.

On April 3, 2009, Torres, as President of Novel Homes, executed a note in favor of Bank Iowa in the amount of $193,800.00 ("Pine Ave. Construction Loan"). The purpose of this loan was for "construction: 325 Pine Ave. Norwalk, IA." At the time of the Complaint, the current balance on the Pine Ave. Construction Loan was $82,093.16. The note provides that it is separately secured by a Real Estate Mortgage ("REM") filed on 11-09-07 in Warren County on 325 Pine Ave, and a REM filed 11-24-08 in Dallas County on 1620 SE Bristol. The note also contains the following additional terms: "$20,000 principal paydown [sic] required for release of 1620 SE Bristol Dr, Waukee from this note." Novel Homes submitted and received two requests for advances on the Pine Ave. Construction Loan. The first request, dated April 6, 2009 was for $20,277.90 for expenses related to excavation, lot staking, erosion control, foundation and

groundwork. The second request, dated April 10, 2009, was for lumber, windows, trucking, waterproofing, tools, fill, and generator rental in the amount of $26,450. (collectively "Advance Requests").

Novel Homes ceased operating on April 17, 2009. Thereafter, on April 29, 2009, Novel Homes supplied a listing of open accounts receivable, via email to Bank Iowa, which showed balances owing in the total amount of $65,236.67.

## DISCUSSION

Bank Iowa seeks to have the debts owed by Novel Homes under each of the loans listed above declared nondischargeable under 11 U.S.C. sections 523(a)(2)(A), 523(a)(2)(B) and/or 523(a)(6) in Defendant's personal bankruptcy pursuant to the Guaranty dated November 19, 2007.[3] Dischargeability actions are narrowly construed against the creditor and in favor of the debtor. See Lipka v. Donley (In re Donley), 115 B.R. 502, 503 (Bankr. E.D. Pa. 1990) (citing Koltman v. Hammill (In re Hammill), 61 B.R. 555 (Bankr. E.D. Pa. 1986)). To succeed, a plaintiff must prove the required elements by a preponderance of the evidence. See First Nat'l Bank of Olathe, Kan. v. Pontow, 111 F.3d 604, 608 (8th Cir. 1997); Merchs. Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

Under either 523(a)(2)(A) or 523(a)(2)(B), the Debtor must have obtained money or credit in connection with the false information. See 11 U.S.C. § 523(a)(2)(A)-(B) (2011); Am. Bank of Commerce v. Powell (In re Powell), 423 B.R. 201, 210 (Bankr. N.D. Tex. 2010). As a preliminary matter, the Court determines that this initial element has not been met as to the Equipment Loan and the Accounts Receivable Loan. Bank Iowa and Novel Homes entered into the Equipment Loan on April 24, 2008, and the Accounts Receivable Loan on December 18,

---

[3] It is well settled that "an individual may affirmatively assume personal liability for a corporate debt" by guarantee of payment. 18 C.J.S. Corporations § 512 (2009).

2008.[4]  The Reports that Bank Iowa utilizes to prove that a false statement was made are all dated March 18, 2009.  There was no evidence presented by Bank Iowa which indicates that any advances or extensions of credit were made under either the Equipment or Accounts Receivable Loan which relied upon the March 18, 2009 Reports.   The exception to discharge provided for at 11 U.S.C. section 523(a)(2) are not applicable to the Equipment Loan and Accounts Receivable Loan, and these obligations are discharged.

## 11 U.S.C. section 523(a)(2)(A)

Bank Iowa's complaint seeks to have the debt owed to it by Defendant excepted from discharge pursuant to 11 U.S.C. section 523(a)(2)(A) (2011) which provides that:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Bank Iowa's claims under this provision appear to be based primarily upon the argument that Torres's conduct in misrepresenting the purpose of the Advance Requests was designed to defraud Bank Iowa.

To establish a prima facie case, a creditor bears the burden of proof on the following elements:

> 1) that the debtor made a representation;
> 2) that at the time the debtor knew the representation was false;
> 3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor;
> 4) that the creditor justifiably relied on such representation; and
> 5) that the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.

---

[4] The Guaranty dated December 18, 2008 which was *specifically* identified in the Accounts Receivable Loan was not admitted into evidence and therefore is not considered as a basis for Torres' personal liability on this obligation.

In re Moen, 238 B.R. at 790 (citations omitted); see also Marcusen v. Glen (In re Glen), 427 B.R. 488, 492 (B.A.P. 8th Cir. 2010). Fraud may be proven by either direct or circumstantial evidence. See In re Donley, 115 B.R. at 503.

Bank Iowa asserts that Torres misrepresented the purpose of the draw requests he submitted for Pine Avenue as set forth on the Advance Requests. Lists were provided by Torres in the total amount of $46,727.90 which specifically identified suppliers and amounts to be paid. Mark Van Landschoot ("Van Landschoot"), the chief credit officer for Bank Iowa, testified that when he received the second Advance Request, he questioned it, but was assured by Torres that the information was correct and the money was needed so early in the construction process because the suppliers had changed their policies and had requested items to be paid "up front."

Canceled checks confirm that the majority of checks written after receipt of the two advances were made payable to parties other than the suppliers identified on the Advance Requests. However, payments were made to Gilcrest Jewett in the amount of $5,000 and to Gallon, Inc. in the amount of $10,000 from the advanced funds. Both of these entities were set forth on the draw request listings, but were paid in amounts that differed from the identified payment.

Torres does not fully explain why services were not performed, or payment was not in accord with his written list. He stated that other funds were deposited into the Novel Homes Bank account from which payments could have been made to the suppliers. No evidence was presented by the Defendant which substantiates this scenario. The only evidence before the Court indicates that the majority of entities listed on the Draw Requests were not paid. Based upon the record, Torres did not intend to utilize the funds obtained under the Advance Requests for the stated purposes. Bank Iowa had no reason to suspect that Novel Homes was having

financial difficulties at the time the Advance Requests were funded. Reliance on the representations made by Torres as to the need for funds and his intended use of the advances was justified. Bank Iowa has met its burden in proving that a portion of the Advance Requests made on the Pine Ave. Construction Loan be excepted from discharge.

The total amount owing under the Advance Requests is reduced by payment to Gilcrest Jewett in the amount of $5,000 and to Gallon, Inc. in the amount of $4,800. The amount of $36,927.90 is not discharged pursuant to 11 U.S.C. section 523(a)(2)(A).

## 11 U.S.C. section 523(a)(2)(B)

According to Bank Iowa, Torres misrepresented the financial status of Novel Homes by submitting the falsified March 18, 2009 AR Report, profit and loss statement, and balance sheet (collectively, "Reports").[5] These Reports were written statements concerning the debtor's or an insider's financial condition. As such, they fall under the exception to discharge found in 11 U.S.C. section 523(a)(2)(B). See Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 877 (8th Cir. 1985).

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . . use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11. U.S.C. § 523(a)(2)(B) (2011). One or more of these required elements have not been established. As more fully discussed below, the amounts owing under the Letter of Credit and Builders Risk Loan are not excepted from discharge.

---

[5] Bank Iowa asserts that the information contained in the AR Report was carried over to the Profit and Loss Statement, and Balance Sheet, provided by Novel Homes, which also renders these documents false.

"A written statement is materially false if it paints a *substantially* untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." Northland Nat'l Bank v. Lindsey (In re Lindsey), No. 10-6045, 2011 WL 383735, at *2 (B.A.P. 8th Cir. Feb. 8, 2011) (citing Premier Bank v. Koester (In re Koester), 437 B.R. 363, 368 (Bankr. E.D. Mo. 2010)) (emphasis added).  At the Bank's request, Torres provided a listing of accounts receivable which reflected balances owing on April 29, 2009 in the amount of $65,236.67.[6]  The Defendant admitted at trial that some items listed on the AR Report dated March 18, 2009 were disputed, were for work which was never completed, should have been moved into the over 90 day category, or were owed by Novel Homes' creditors from which Novel Homes would not attempt to collect due to potential set-off issues.  Outstanding receivables that are later found to be disputed, uncollectible, or subject to a valid defense relate to matters that are different from appropriately including a receivable as owing on a financial report using the accrual method of accounting.

It is unclear whether Bank Iowa is arguing that the March 18, 2009 AR Report was false solely due to the Defendant's conduct in categorizing the overdue status of some receivables, or whether it is arguing that because the listing provided on April 29, 2009 reflected a substantially lower amount of outstanding receivables that this supports a finding of fraud as to the older report.  Based upon the differing formats of the written information it is not possible to determine whether account receivables may have been paid after March 18, 2009, and before April 29, 2009.  The element of a materially false writing has not been substantiated by a preponderance of the evidence.

Notwithstanding the alleged inaccuracies on the Reports, Bank Iowa must also prove that the false writing was made with the intent to deceive.

---

[6] It was not in the format previously utilized in submitting the aging of accounts receivable to Bank Iowa.

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.' The focus is, then, on whether the debtor's actions 'appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.'

In re Lindsey, 2011 WL 383735, at *4 (internal citations omitted). Torres denied making a fraudulent statement and having the intent to deceive. He testified that it was neither his intent nor his desire to close his business at the time he submitted the Reports. Bank Iowa introduced circumstantial evidence to attempt to prove Torres' intent. Bank Iowa recounted that Torres had previously submitted an AR Report with numbers too low to sustain the current loan balance and was forced to pay down one of the loans.[7] Because of this experience, the Plaintiff argues that in order to obtain the funds requested, Torres engaged in fraudulent conduct because he knew that additional credit would not be extended if the AR Report was below a certain number. The Court declines to adopt this conclusion. A restructure of loans based upon financial reports submitted in April 2008 does not automatically result in a conclusion that the Defendant intentionally submitted false information in order to obtain the loans at issue in this proceeding. Bank Iowa has not shown that Torres intended to deceive.

Assuming, *arguendo,* that there was a materially false writing made with the intent to deceive, a creditor must also show that it relied on the written statement. It is not necessary to prove that reliance was based solely upon the false information, it is sufficient that the false financial statement was "a contributory cause of the extension of credit." Coughlin v. First Nat'l

---

[7] The Accounts Receivable Loan was substantially paid down after an accounts receivable aging report was provided to Bank Iowa which did not show enough expected income. In order to facilitate this pay-down, the Equipment Loan was restructured.

Bank of Boston (In re Coughlin), 27 B.R. 632, 637 (B.A.P. 1st Cir. 1983). This standard has not been satisfied based upon the record.

An examination of the AR Reports for the time period of October 2007 through March 18, 2009 indicates that the total anticipated receivables ranged from $148,719.93 to $247,039.80. During this same time period the accounts owing over ninety days ranged from $2,034.00 on the October 2007 report to $48,577.84 on the December 3, 2008 report. A comparison of the reports clearly indicates that many of the accounts described as over ninety days due remained similar over several reporting periods. When a receivable reflected in a previous report is not included in a subsequent report it can be inferred that a payment was received which closed the open account receivable. Applying this reasoning to a review of the AR Reports leads to a conclusion that substantial payments had historically been received on accounts that were both current and reflected as being over due. Pursuant to the formula utilized by the Plaintiff for funding the Accounts Receivable Loan, the March 18, 2009 AR Report indicates that the existing line of credit was within an acceptable range.

Bank Iowa describes itself as a cash flow lender, not a collateral based lender. In making this characterization, the Plaintiff appears to imply that it would not have entered into the Letter of Credit or Builders Risk Loan based solely upon inadequate cash to secure repayment. This position is at odds with the information contained on the individual loan documents, the alleged security agreements, real estate mortgages, personal guarantees and evidence presented by the Defendant at trial. Clearly, Bank Iowa relied upon collateral unrelated to the cash flow generated by accounts receivables in structuring its loans. This is most clearly demonstrated by the facts surrounding the negotiation of the Letter of Credit.

As a result of a disputed mechanics lien, the Letter of Credit was established to facilitate closing on a real estate sale. At the time of the Complaint, a request to fund the Letter of Credit had not yet been received, but an exhibit submitted at trial and the accompanying testimony indicates that funding eventually occurred in the amount of $16,759.03. Torres contends that many of the loans were additionally cross collateralized with mortgages and equity in pending construction projects. His statements in this regard are credible and supported by the record. The note associated with the Letter of Credit specifically references a security agreement dated March 10, 2009.[8] The loan document did not identify the personal guaranty[9] or any other security agreements. The Defendant submitted copies of email communications with Bank Iowa regarding the Letter of Credit transaction. One email dated Monday, March 2, 2009 at 2:38 p.m. from Torres states that "[t]he bonding company is requiring one to cover me for lien on pine until we can go to trial so we can close." Another email, dated March 9, 2009 at 10:58 a.m. from Mark Van Landschoot states that the letter of credit was approved, but that there were stipulations.

> The only way I could figure to make this work is to do a $10,000 loan tied to the Bristol Dr House. Put that money in a Certificate of Deposit Account and use that to secure the letter of credit. 1st stipulation is to provide the settlement statement on the house at 300 W Pine to Bank Iowa. Any excess proceeds to the seller will be applied to the lot loan in Norwalk. 2nd stipulation is to provide the settlement statement on the house at 1620 SE Bristol Dr to Bank Iowa. The $10,000 loan will be included in our payoff and then any excess proceeds will be applied to the lot loan to bring us to at least 80% of the original purchase price.

---

[8] Neither the Letter of Credit nor the Security Agreement is attached to the Exhibit admitted at trial.
[9] Based upon the record the Court cannot make a finding in the Plaintiff's favor related to theories of piercing the corporate veil or alter ego which were raised at trial.

Based upon the terms involved with the Letter of Credit there is no reason to believe that the Reports were even a contributory factor relied upon by the Plaintiff in making this credit decision.

The remaining loan at issue involves the extension of credit related to the Builders Risk Insurance. Although the Plaintiff may have relied upon the Reports, under this section, it must also show that the reliance was reasonable.

> "The reasonableness of a creditor's reliance . . . should be judged in light of the totality of the circumstances." Among other things, a court may consider "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."

Sinclair Oil Corp. v. Jones (In re Jones), 31 F.3d 659, 662 (8th Cir. 1994) (citing Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993)).

Van Landschoot testified that he reviewed all of the information provided by Torres related to Novel Homes. Bank Iowa had over two years' worth of Reports from Novel Homes to review. None of the other profit and loss statements or balance sheets for similar time periods as those submitted on March 18, 2009 show figures as high as those that Bank Iowa alleges are false. This deviation constitutes a red flag for purposes of alerting the lender that there may be some inaccuracy in the information. An examination of the previous AR Reports, including the one submitted on December 3, 2008, would have shown that some of the accounts should have been included in the "over 90" days category.

> [A] person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.
>
> . . .

> [W]here, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, *or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.*

Willens v. Bones (In re Bones), 395 B.R. 407, 432 (Bankr. E.D. Mich. 2008) (citing Field v. Mans, 516 U.S. 59, 70-71 (1995)) (emphasis added). The Plaintiff apparently did not question whether such entries were the result of an oversight or sloppy reporting, and made no independent investigation based upon the information that was contained in the Reports that may have been questionable. Mindful of the standard that requires exceptions to discharge to be "strictly construed against the creditor" the reliance of Bank Iowa on the Reports was not reasonable.[10] See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir.1998).

The Plaintiff did not meet its burden of proof in order to have the amounts loaned under the Builder's Risk Insurance Loan and the Letter of Credit excepted from discharge under 11 U.S.C. section 523(a)(2)(B).

## 11 U.S.C section 523(a)(6)

The Plaintiff also alleges that the debts are excepted from discharge pursuant to 11 U.S.C. section 523(a)(6) (2011) which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
> . . .
>     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

---

[10] There were no advances made under the Accounts Receivable Loan (described as a credit line) for either the Builders Risk Insurance or the Letter of Credit. Whether Plaintiff's reliance on the AR Report was reasonable is also subject to whether it held an enforceable security interest in the accounts receivable. No evidence was provided to establish what collateral may have been subject to such a claim. The Defendant's statements, however, indicate that there may have been issues involving perfection of security interests which are evidenced by the assistance he provided in obtaining titles and turning over items to Bank Iowa. (See also Docket numbers 4 and 11).

The United State Supreme Court resolved a split in the circuits related to the necessary action required to have a debt considered non-dischargeable due to willful and malicious conduct. The Court held that reckless or negligent conduct that results in injury does not meet the standard required under 11 U.S.C. section 523(a)(6). See Kawaauhau v. Geiger, 523 U.S. 57 (1998). The statute requires two distinct elements. "Willfulness is defined as 'headstrong and knowing' conduct and 'malicious' as conduct 'targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause . . . harm.'" Fischer v. Scarborough (In re Scarborough), 171 F.3d 638, 641 (8th Cir. 1999) (quoting Johnson v. Miera (In re Miera), 926 F.2d 741, 743 (8th Cir. 1991)). The malicious behavior must be more than reckless or intentional acts that result in harm. See id. The Eighth Circuit further clarified its interpretation of "willfulness" and stated, "in this circuit the 'willful' element is a subjective one, requiring proof that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." Blocker v. Patch (In re Patch), 526 F.3d 1176, 1180-81 (8th Cir. 2008).

There is no evidence that the Defendant's acts were targeted at the creditor in such a way that they were certain or almost certain to cause harm. Nor was there any evidence submitted to prove that Torres desired to cause harm by his actions in connection with any of the loans identified by the Plaintiff. The Court found Torres' testimony credible that it was not his intent or desire to abandon projects and close his business. Further, Torres testified that he assisted Bank Iowa by turning over property and obtaining documents so that assets could be liquidated. This conduct does not support a finding that the Defendant's conduct was either willful or malicious.

On March 31, 2008, Continental Western Group issued a check made jointly payable to "Novel Homes, Inc., and Ford Motor Credit Company" in the amount of $42,654.00. Torres endorsed the check on behalf of Novel Homes. There was no endorsement by the co-payee Ford Motor Credit Company. The check related to a truck owned by Novel Homes. The Plaintiff's basis for contending that this amount be excepted from discharge based upon Torres' conduct is not clear.[11] The Court presumes that the Plaintiff may be requesting a finding that by making the deposit Torres engaged in conduct that was willful and malicious, or somehow constituted conversion of the Bank's alleged collateral.[12] The Plaintiff did not refuse to deposit the check into the Novel Homes bank account due to a lack of the co-payee's endorsement. Although Bank Iowa alleges that it was required to reimburse Ford Motor Credit Company for the full amount of the check there is a lack of evidence to substantiate this fact.

The testimony and the circumstantial evidence do not show "willful and malicious" conduct which would except any of the claims asserted by Plaintiff from discharge pursuant to 11 U.S.C. section 523(a)(6).

---

[11] To the extent its argument related to this transaction is actually based upon 11 U.S.C. section 523(a)(2)(A) the Court finds that the Plaintiff has not met its burden on the requisite elements of a representation, reliance and its resulting loss or damage, to support a finding of nondischargeability.

[12] There is no evidence to suggest that Bank Iowa held the vehicle as collateral.

Based upon the foregoing it is hereby ordered that:

1. The amount of $36,927.90 is excepted from discharge pursuant to 11 U.S.C. section 523(a)(2)(A) and judgment will enter accordingly.

2. The remaining claims are dismissed, and the amounts asserted by the Plaintiff are discharged pursuant to 11 U.S.C. 727.

3. The parties shall bear their own costs.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Adversary Proceeding
Others: S. Torres, Defendant